Louisiana Spec. 14-BR1-2A-NL Paid up R2/99

No. **450383** Filed for record at **12:43** P.M. **MAY 0 3 2013**
Recorded: Book **1647** Page **158**

# OIL, GAS AND MINERAL LEASE

CONVEYANCE Records, Claiborne Parish, La.

_____
Dy. Clerk D.C., Claiborne Parish, La.

THIS AGREEMENT made this **10th** day of **April**, **2013**, between

**Marjorie C. Williams, a single woman**

Lessor (whether one or more) whose address is: 1128 Stonebryn Dr., Harbor City, CA 90710

and **Antero Energy Partners, LLC** , Lessee,

whose address is 8401 N. Central Expressway, Suite 840, Dallas, Texas 75225

WITNESSETH:

1. Lessor in consideration of One Hundred Dollars and Other Valuable Considerations ($100.00 & OVC), in hand paid, of the royalties herein provided, and of the agreement of Lessee herein contained, hereby grants, leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for and production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession and transportation of said minerals (either from said land or acreage pooled therewith), and the right to dispose of salt water, with the right of ingress and egress to and from said lands at all times for such purposes, including for operations hereunder or in connection with similar operations on adjoining land; the land to which this lease applies and which is affected hereby, being situated in **Claiborne** Parish, Louisiana, and described as follows, to-wit:

**TOWNSHIP 23 NORTH, RANGE 7 WEST**

Section 11: The SW/4 of SE/4, Less & Except 7.22 acres off East side; and 2.34 off South side of NW/4 of SE/4;
Section 14: The NW/4 of NE/4

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

This lease shall also extend and apply to any interest therein which Lessor may hereafter acquire, including, but not limited to, outstanding mineral rights acquired by reversion, prescription or otherwise, and includes battures, accretions, roads, highways, easements, right-of-ways and all land, if any, contiguous or adjacent to, or adjoining the land particularly described above. Lessor agrees to execute any supplemental instrument requested by lessee for a more complete or accurate description of said land. For the purposes of determining the amount of bonus and the shut-in royalty payment hereunder, said land shall be deemed to contain **74.64** acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof.

2. Subject to the other provisions herein contained, this lease shall be for a period of **THREE (3)** years from the date hereof (called "primary term") and as long thereafter as (1) oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith; or (2) it is maintained in force in any other manner herein provided.

3. For the consideration hereinabove recited, this lease shall remain in full force and effect during the primary term, without any additional payment and without Lessee being required to conduct any operations on the land (either before or after the discovery of minerals), except to drill such wells as might be necessary to protect the land from drainage, as hereinafter provided.

4. The royalties to be paid by Lessee are: (a) on oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, one-eighth of that produced and saved from said land, same to be delivered at the wells or to the credit of Lessor in the pipe line to which the wells may be connected; Lessor's interest in either case to bear its proportion of any expenses for treating the oil to make it marketable as crude; Lessee may from time to time purchase any royalty oil or other liquid hydrocarbons in its possession, paying the market price therefor existing for the field where produced on the date of purchase; (b) on gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; such gas, casinghead gas, residue gas, or gas of any other nature or description whatsoever, as may be disposed of for no consideration to Lessee, either through unavoidable waste or leakage, or in order to recover oil or other liquid hydrocarbons, or returned to the ground, shall not be deemed to have been sold or used either on or off the premises within the meaning of this paragraph 4 hereof; (c) on all other minerals mined and marketed, one-eighth, either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be one dollar ($1.00) per long ton.

5. If Lessee during or after the primary term should drill a well capable of producing gas or gaseous substances in paying quantities, (or which although previously produced Lessee is unable to continue to produce) and should Lessee be unable to operate said well because of lack of market or marketing facilities or governmental restrictions, then Lessee's rights may be maintained beyond or after the primary term without production of minerals or further drilling operations by paying Lessor as royalty a sum equal to one dollar (1.00) per acre of land covered hereby per year, the first payment being due, if said well should be completed or shut-in after the primary term, within ninety (90) days after the completion of such well or the cessation of production and such payment will extend Lessee's rights for one year from the date of such completion or cessation. If such a well should be completed during the primary term, the first payment, if made by Lessee, shall be due within 90 days after such well is shut-in, or before the expiration date of the primary term herein fixed, whichever is the later date. Thereafter Lessee's rights may be continued from year to year by making annual payments in the amount stated on or before the anniversary date beginning with the date of completion of said well (if completed after the primary term) or the end of the primary term (if completed prior thereto) as the case may be; each of such payments to extend Lessee's rights for one year. The annual payments herein provided for may be deposited to Lessor's credit in the

**Pay directly to Lessor** Bank of _____, which bank shall be and remain Lessor's agent for such purpose regardless of any change or changes in the ownership of the land or mineral rights therein. The owners of the royalty as of the date of such payments shall be entitled thereto in proportion to their ownership of said royalty. The provisions of this paragraph shall be recurring at all times during the life of this lease. Should any well producing gas or gaseous substances be completed on a drilling unit which includes any part of the land herein leased, the provisions of this paragraph shall be subject to all other agreements herein contained allowing the pooling of the above described lands with other lands.

6. If within ninety (90) days prior to the end of the primary term, Lessee should complete or abandon a well on the lands described above or on land pooled therewith, or if production previously secured should cease from any cause, this lease shall continue in force and effect for ninety (90) days from such completion or abandonment or cessation of production. If at the expiration of the primary term or at the expiration of the ninety (90) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land or on land pooled therewith, but Lessee is then engaged in operations for drilling, completion or reworking thereon, or operations to achieve or restore production, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in operations for drilling, completion or reworking, or operations to achieve or restore production, with no cessation between operations or between such cessation of production and additional operations of more than ninety (90) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder or from land pooled therewith. If sulphur be encountered on said premises or on land pooled therewith, this lease shall continue in force and effect so long as Lessee is engaged with due diligence in explorations for and/or erecting a plant for the production of sulphur and thereafter subject to the foregoing provisions hereof so long as oil, gas, sulphur or other mineral is produced from said land hereunder or from land pooled therewith.

7. Lessee is hereby granted the right as to all or any part of the land described herein, without Lessor's joinder, to combine, pool or unitize the acreage royalty or mineral interest covered by this lease, or any portion thereof, at any time during the life of this lease, with any other land, lease or leases, with any other land, lease or leases, royalty or mineral interests in or under any other tract or tracts of land in the vicinity thereof, whether owned by Lessee or some other person, or corporation so as to create, by the combination of such lands and leases, one or more operating units, as to any and all mineral horizons, provided that no one operating unit shall, in the case of gas, including condensate, embrace more than six hundred forty (640) acres, and in the case of oil, including casinghead gas, embrace more than eighty (80) acres; and provided further, however, that if any spacing or other rules and regulations of the State or Federal Commission, Agency, or regulatory body having or claiming jurisdiction has heretofore or shall at any time hereafter permit or prescribe a drilling or operating unit or spacing rule in the case of gas, including condensate, greater than six hundred forty (640) acres, or in the case of oil or casinghead gas greater than eighty (80) acres, then the unit or units herein contemplated may have, or may be redesigned so as to have, as the case may be, the same surface content as, but not more than, the unit or the acreage in the spacing rule so prescribed or permitted. However, it is further specifically understood and agreed, anything herein to the contrary notwithstanding, that the Lessee shall have the right to, and the benefit of an acreage tolerance of ten per cent in excess of any drilling or operating unit authorized herein. The commencement of operations for the drilling of a well, or the completion of a well to production of either oil, gas, casinghead gas, condensate or other minerals on any portion of an operating unit in which all or any part of the land described herein is embraced, or production of oil, gas, casinghead gas, condensate, or other minerals therefrom shall have the same effect under the terms of this lease as if a well were commenced, completed or producing oil, gas, casinghead gas, condensate, or other minerals in paying quantities on the land embraced by this lease. Lessee shall execute in writing and file for record in the records of the Parish in which the lands herein leased are located, an instrument identifying or describing the pooled acreage, or an instrument supplemental thereto redesignating same, as the case may be. Either prior to the securing of production from any unit created under the authority hereinabove granted, or after cessation of production therefrom Lessee shall have the right to dissolve the unit so created, without Lessor's joinder or further consent, by executing in writing and placing of record in the Parish or Parishes in which the lands making up such unit may be located, an instrument identifying and dissolving such unit. The provisions hereof shall be construed as a covenant running with the land and shall inure to the benefit of and be binding upon the parties hereto, their heirs, representatives, successors and assigns. In the event such operating unit or units is/are so created by Lessee, Lessor shall receive out of production or the proceeds from production from such operating unit or units or out of the shut-in royalty provided for above, such portion of the royalty or of the shut-in royalty specified herein as the number of acres (mineral acres) out of this lease placed in any such operating unit or units bears to the total number of acres included in such operating unit or units.

8. If Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the payments herein provided shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

9. Lessee shall have the exclusive right to explore the land herein described by geological, geophysical or other methods, whether similar to those herein specified or not and whether now known or not, including the drilling of holes, use of torsion balance, seismograph explosions, magnetometer, or other geophysical or geological instruments, test or procedures, for the purpose of securing geological and geophysical information. All information obtained by Lessee as a result of such activity shall be the exclusive property of Lessee, and Lessee may disseminate or sell such information without Lessor's consent. In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises, or on any adjacent or adjoining lands, as may be reasonably necessary for such purpose, including but not limited to the drilling of wells, construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport oil, gas and other substances. Lessee shall have free use of oil, gas, casinghead gas, condensate, and water from said land, except water from Lessor's wells, for all operations hereunder, including repressuring, pressure maintenance and recycling, and the royalty shall be computed after deducting any so used. Lessee shall have the right at any time during or after the expiration of this lease to remove all property and fixtures placed by Lessee on said land, including the right to draw and remove all casing. When required by Lessor, Lessee will bury all pipe lines below ordinary plow depth, and no well shall be drilled within two hundred feet of any residence or barn now on said land without Lessor consent. In the event a well or wells, producing oil, gas, casinghead gas or condensate in paying quantities should be brought in on adjacent lands not owned by the Lessor and within one hundred fifty feet of and draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances.

450383

10. The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the heirs, executors, administrators, successors and assigns, but no change or division in ownership of the land, or royalties, however accomplished shall operate to enlarge the obligations or diminish the rights of Lessee. No such change or division in the ownership of the land, or royalties shall be binding upon Lessee for any purpose until such person acquiring any interest has furnished Lessee, at its principal place of business, with a certified copy of the instrument or instruments, constituting his chain of title from the original Lessor. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge Lessee of any obligations hereunder to Lessor and, if Lessee or assignee of part or parts hereof shall fail to comply with any other provisions of the lease, such default shall not affect this lease insofar as it covers a part of said lands upon which Lessee or any assignee shall comply with the provisions of the lease. In addition, Lessee may at any time and from time to time execute and deliver to lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations as to the released acreage or interest.

11. In case of suit, adverse claim, dispute or question as to the ownership of the royalties (or some part thereof) payable under this lease, Lessee shall not be held in default in payment of such royalties (or the part thereof in dispute), until such suit, claim, dispute or question has been finally disposed of, and Lessee shall have thirty (30) days after being furnished with a certified copy of the instrument or instruments disposing of such suit, claim or dispute, or after being furnished with proof sufficient, in Lessee's opinion, to settle such question, within which to make payment. Should the right or interest of Lessee hereunder be disputed by Lessor, or any other person, the time covered by the pendency of such dispute shall not be counted against Lessee either as affecting the term of the lease or for any other purpose, and Lessee may suspend all payments without interest until there is a final adjudication or other determination of such dispute.

12. In case of cancellation or termination of this lease from any cause, Lessee shall have the right to retain, under the terms hereof, around each well producing, being worked on, or drilling hereunder, the number of acres in the form allocated to each such well under spacing and proration rules issued by the Commissioner of Conservation of the State of Louisiana, or any other State or Federal authority having control of such matters; or any unit or units formed pursuant to paragraph 7 or, in the absence of such rulings, unit or units, forty (40) acres around each such well in as near a square form as practicable, and in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have sixty (60) days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.

13. When drilling, reworking, production or other operations are delayed or interrupted by force majeure, that is, by storm, flood or other acts of God, fire, war, rebellion, insurrection, riot, strikes, differences with workmen, or failure of carriers to transport or furnish facilities for transportation, or as a result of some law, order, rule, regulation, requisition or necessity of government, Federal or State, or as a result of any cause whatsoever beyond the control of the Lessee, the time of such delay or interruption shall not be counted against Lessee, anything in this lease to the contrary notwithstanding, but this lease shall be extended for a period of time equal to that during which Lessee is so prevented from conducting such drilling or reworking operations on, or producing oil, gas, casinghead gas, condensate or other minerals from, the premises; provided that during any period that this lease is continued in force after its primary term solely by force majeure as herein provided, Lessee shall pay to the owners of the royalty hereunder the shut-in royalty provided in paragraph 5 hereof, and in the manner therein provided, without regard to whether or not there is a producing well shut in, located on said land or on land with which the lease premises or any part thereof has been pooled.

14. Lessee shall pay for actual damages caused by its operations to growing crops and timber on said land leased herein.

15. Notwithstanding the death of any party Lessor, or his successor in interest, the payment or tender of all sums accruing hereunder in the manner provided above shall be binding on the heirs, executors and administrators of such person.

16. Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the Lessee at its option shall have the right to redeem for Lessor, by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof. In case of payment of any such mortgage, taxes or other liens by Lessee, in addition to the right to subrogation herein granted, Lessee shall also have the right to retain any royalties which become due Lessor hereunder and to repay itself therefrom, and the retention of such royalties by Lessee shall have the same effect as if paid to the Lessor in whose behalf payment of any mortgage, taxes or other liens was made.

17. This lease shall be binding upon all who execute it, whether or not named in the body hereof as Lessor, and without regard to whether this same instrument, or any copy thereof, shall be executed by any other Lessor named above.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

WITNESSES:                                         LESSOR (WHETHER ONE OR MORE)

_[signature]_                                       _[signature] Marjorie C. Williams_
                                                   Marjorie G. Williams

_TRAYCEE FARMER_

---

**DIRECT ACKNOWLEDGMENT**

STATE OF _____
PARISH/COUNTY OF _____

On this _____ day of _____, _____, before me, the undersigned authority, personally appeared _____

to me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission expires _____   _See attached._
                                                NOTARY PUBLIC IN AND FOR

**ATTESTING ACKNOWLEDGMENT**

STATE OF _____
PARISH/COUNTY OF _____

Before me, the undersigned authority, personally came and appeared _____ who being first duly sworn deposes and says that he/she was one of the subscribing witnesses to the execution of the foregoing instrument by _____

who signed the same in his/her presence and that of the other subscribing witness(es) to such signature (s) whose name(s) (signatures) are affixed as such, and that he/she now recognizes all said signatures to be true and genuine.

                                                Subscribing Witness
Sworn to and subscribed before me, notary, on this _____ day of _____, _____

My Commission expires _____
                                                NOTARY PUBLIC IN AND FOR

**CORPORATE ACKNOWLEDGMENT**

STATE OF _____
PARISH/COUNTY OF _____

Before me, the undersigned authority, personally came and appeared _____ to me personally known, who being by me duly sworn,

declared that he is the _____ of _____ a _____
Corporation, and that he executed the foregoing instrument on behalf of said corporation and further acknowledged the instrument to be the free act and deed of said corporation.

Sworn to and subscribed before me, notary, on this _____ day of _____, _____

My Commission expires _____
                                                NOTARY PUBLIC IN AND FOR

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

State of California

County of __LOS Angeles__

On __04/17/2013__ before me, __LILIAN PUDJOWIBOWO, A NOTARY PUBLIC__,
(Here insert name and title of the officer)

personally appeared __Marjorie C. Williams__,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

(Notary Seal)

LILIAN PUDJOWIBOWO
COMM. # 2002129
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. JAN. 23, 2017

---

## ADDITIONAL OPTIONAL INFORMATION

**DESCRIPTION OF THE ATTACHED DOCUMENT**

__OIL, GAS and MINERAL LEASE__
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date _____

_____
(Additional information)

**CAPACITY CLAIMED BY THE SIGNER**
- ☑ Individual (s)
- ☐ Corporate Officer
  _____ (Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they,- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

CONV BK __1647__ PG __160__          450383

2008 Version CAPA v12.10.07 800-873-9865 www.NotaryClasses.com

EXHIBIT A

## EXHIBIT A

This exhibit is attached to and forms a part of an oil, gas and mineral lease by and between MARJORIE C. WILLIAMS, Lessor, and ANTERO ENERGY PARTNERS, LLC, a Texas limited liability company, as Lessee, which is hereinafter referred to as the "Lease", and shall supersede all provisions of the printed form which are in conflict herewith:

1. DEPTH LIMITATION: Unless a well shall then be drilling, at the expiration of the primary term, Lessee shall, by written recordable instrument, release all rights at a depth greater than 100 feet (100') below the base of the deepest producing formation underlying the leased premises or any portion thereof which may be included in a producing unit. In case a well is drilling when the primary term ends, the determining date shall be the date when such well is completed as a producer or a dry hole.

2. ROYALTY: With reference to Paragraph 4 of the Lease concerning the payment of royalties, in each instance where the fraction one-eighth (1/8) appears in this paragraph or in any other paragraph of the Lease, that provision is hereby amended so as to provide for a one-fourth (1/4) royalty. Lessor's royalty herein shall be free of all charges and costs imposed by Lessee or its affiliates or related entities whatsoever including, but not limited to production, compression, cleaning, dehydration, metering, detoxification, transportation, accounting and marketing; except that Lessor's royalty will be responsible for its pro rata share of all taxes imposed on severance or production by any municipal, parish, state or federal agency.

3. PRICE: The price to be used in computing the market value of gas or liquids at the well head shall be the price received by Lessee under an arm's length sales contract with parties prudently negotiated in the light of facts and circumstances existing at the time of consummation of such contract free and clear of costs of delivery, including, but not limited to costs of transportation, dehydration, compression or gathering.

Should Lessee negotiate a gas or liquids sales contract with an affiliate, parent or subsidiary company of Lessee, then the price so negotiated and paid to Lessee shall be not less than the price which Lessee would have received from a third party negotiated under an arm's length gas or liquids sales contract prudently negotiated in the light of the facts and circumstances existing at the time of consummation of such contract. However, should Lessee by virtue of any order of any state or federal regulatory body receive less than the price provided for in any gas or liquids sales contract entered into by Lessee, such lesser price shall be paid.

4. SHUT-IN ROYALTIES: The shut-in royalty as provided for in Paragraph 5 of the Lease shall be paid at the rate of Two and No/100 ($2.00) Dollars per net mineral acre per month for each full calendar month, instead of the amount of the annual delay rental as provided in the printed lease form. Shut-in royalty shall be paid in the manner and under the conditions as provided for in said Paragraph 5, with the first shut-in royalty payment period to begin six (6) months after the completion of the shut-in well capable of producing oil, gas or other liquid hydrocarbons on the leased lands or lands pooled or unitized herewith, but the right

to so maintain the lease by shut-in royalty payments shall be limited to a period of one (1) year after commencement of shut-in royalties.

5. WATER WELLS: Lessee's free use of water from the leased premises, except water from Lessor's wells, as provided in Paragraph 9 of the Lease shall be limited to water used in connection with drilling operations only and shall not extend to surface water. Lessee shall not have the right to use any surface water from Lessor's premises.

6. NON WARRANTY & WAIVER OF UNJUST ENRICHMENT: Anything in the Lease to the contrary notwithstanding, it is expressly agreed and understood by and between the parties hereto that the Lease is made without any warranty of title whatsoever, or even for a return of any portion of the consideration. Lessee waives any claim it may have against Lessor for unjust enrichment.

7. PUGH CLAUSE: Anything in the Lease to the contrary notwithstanding, actual drilling on, or production from, any unit or units embracing exclusively the lands covered by the Lease or both land herein leased and other land shall maintain the Lease in force only as to that portion of Lessor's land included in such unit or units, whether or not said drilling or production is on or from the leased premises. This Lease may be maintained in force as to the remainder of the land in any manner specified in this lease, provided, that if it be by rental payment, that rental shall be that proportion of the fixed annual rental that the number of acres not affected in such unit or units bears to the total acreage herein leased and, provided further, that the Lease may not be so maintained in force by rental payments on land outside any such unit more than two (2) years after commencement of such rental payments.

8. SURFACE OPERATIONS: The lands covered by this lease are utilized by Lessor primarily for the growing of timber. Accordingly, Lessee agrees:

   (a) To conduct its operations so as not to unreasonably interfere with Lessor's use of the property and its timber.

   (b) To use and build only such roads as are reasonably necessary in its operations. Upon written request of Lessor, upon cessation of operations, all road beds shall be restored to their original condition.

   (c) To give to Lessor or Lessor's representative identified in paragraph 13 fifteen (15) days written notice prior to conducting any operations on the property which will necessitate the cutting of timber including, but not limited to, the building of roads, pits and drill sites. The notice will be in writing and will be accompanied by a plat or map showing the proposed location of such operations.

   (d) That no well will be drilled on the premises within three hundred (300) feet of any structure now, or hereafter, placed on the premises, without written consent of Lessor.

CONV BK 1647 PAGE 162

450383

EXHIBIT A

(e) To bury all pipelines below ordinary plow depth, or to such greater depth as Lessor deems necessary in its operations.

(f) To use its best efforts to extinguish any fire that may result from Lessee's operations and to promptly notify Lessor of any such fire.

(g) To fill slush pits and other excavations within ninety (90) days after operations are completed and to restore, as nearly as possible, the surface to its original condition. Unless otherwise instructed by Lessor, all gravel and other surface material applied to the drill site by Lessee shall be removed. If Lessee fails to do so, Lessor may restore the surface and fill excavations at Lessee's expense.

(h) To release Lessor from any loss or damage to any property which Lessee may place on the leased premises.

9. DAMAGES: Lessee shall pay to Lessor:

(a) Lessee shall pay Lessors reasonable surface damages caused by its use of Lessors' surface, with such damages to be calculated using the sum of $3,500 per acre utilized, but not less than $10,000 per drill site location and $3,500 per acre for other uses of the surface outside the well pad or location.

(b) Lessor's share of such damage amounts shall be calculated based upon Lessor's net ownership interest in the surface estate of the leased premises.

10. INDEMNITY: Lessee, his successors or assigns, agrees to indemnify, defend and hold Lessor harmless for any and all claims, demands and causes of action for damages, liens or injuries asserted by or sustained by third parties, neighboring landowners and employees of Lessee, or his successors or assigns, arising directly, indirectly or in connection with the operations of Lessee hereunder. Notwithstanding the above, Lessor shall pay, with no right of indemnification from Lessee, its portion of any award of damages for which Lessor, its agents, servants or employees, shall be cast in judgment pursuant to a finding of negligence on the part of Lessor, or its agents, servants or employees.

11. HYDROCARBONS ONLY: Anything in this lease to the contrary notwithstanding, this lease is limited to drilling for and the production of liquid or gaseous hydrocarbons only and does not cover or include any rights to search for or mine any sulfur or solid minerals. Lessee shall have no right to remove iron ore, soil, sand, timber or other solid minerals from the Leased Premises to use in its operations on adjoining lands.

12 SALTWATER DISPOSAL: Lessee may not drill or use existing wells on the leased premises for disposal of salt water produced off of the leased premises or lands pooled therewith.

13. ENTRY AND ROADWAYS: Prior to the commencement of any dirt work for the construction of any roads on the leased premises, Lessee agrees to obtain Lessor's written consent (which consent shall not be unreasonably withheld). Any such roadway so constructed shall utilize material used by other Operators in the area to maintain a safe and passable condition for travel by passenger vehicles; (b) maintained at Lessee's sole expense; and (c) designated and constructed in such a manner so as to minimize erosion. The written consent of Marjorie C. Williams, 1128 Stonebryn Drive, Harbor City, California 90710 shall be effective as to Lessor.

14. CONSENT TO ASSIGN: Lessee shall not assign this Lease in whole or in part, without the prior written consent of Lessor, which consent shall not be unreasonably withheld. If Lessee makes a written request for consent to make an assignment from Lessor and Lessor fails to respond in writing within ten (10) days from receipt of the request, it shall be deemed that the Lessor consented to the assignment and Lessee shall be free to make such assignment.

15. Paragraph 4(c) of the Lease shall be null and void and deemed stricken from the Lease.

SIGNED FOR IDENTIFICATION:

_____
Lessor, Marjorie C. Williams
Date Signed: 4/11/13

Antero Energy Partners, LLC,
a Texas limited liability company

By: _____
Its: Managing Member
Date Signed: 5/1/13

exh. a.marjorie c. williams.a 03.27 13

BOOK 1647 PAGE 164                450383

EXHIBIT A

## ACKNOWLEDGMENT

STATE OF TEXAS       §
                     §
COUNTY OF DALLAS     §

On this 1 day of May, 2013, before me personally appeared Robert A. Imel, to me personally known, and known by me to be the person whose genuine signature is affixed to the foregoing document, as Managing Member of **ANTERO ENERGY PARTNERS, L.L.C.**, a Texas limited liability company, who signed said document before me and in the presence of two witnesses, whose names are thereto ascribed as such, being competent witnesses, and who acknowledged, in my presence and in the presence of said witnesses, that he signed the above and foregoing document as his free act and deed and the free act and deed of said **ANTERO ENERGY PARTNERS, L.L.C.**, and for the uses and purposes therein set forth and apparent.

_____
Notary Public in and for the State of TEXAS



NATALIE SHARON LAMMERS
Notary Public, State of Texas
My Commission Expires
May 10, 2016